William O. Purcell (WP 5001)
Jessica L. Jiménez (JJ 3107)
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York  10022
Telephone: 212.536.3900
Facsimile: 212.536.3901

Attorneys for Plaintiff Stone & Youngberg LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
STONE & YOUNGBERG LLC,    :
            :
      Plaintiff,  :
            :
    -against-   :   05 Civ 2614 (RJH)
            :
SCHRODER INVESTMENT   :
MANAGEMENT NORTH AMERICA, INC., :
SCHRODER SERIES TRUST AND  :
SCHRODER SHORT-TERM MUNICIPAL :
BOND FUND,      :
            :
      Defendants. :
            :
--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF

## <u>STONE & YOUNGBERG LLC'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ................................................................................................................... 3

    A.    The Parties ................................................................................ 3

    B.    The COPS ................................................................................. 5

    C.    The Contract ............................................................................. 5

    D.    Schroder Breached the Contract ............................................... 7

ARGUMENT ......................................................................................................... 9

    A.    Standard of Review .................................................................. 9

    B.    The Doctrine of Mutual Mistake Does Not Apply as a Matter of
            Law Because the Mistake Relied Upon By Schroder Was One
            That Only Affected the Value of Securities ........................................ 10

    C.    Schroder Should Bear the Risk Even If Mutual Mistake were to
            Apply ...................................................................................... 14

            1.    Schroder should bear the risk because it was aware
                    that it  had limited knowledge of the facts and elected
                    to proceed ............................................................... 14

            2.    Schroder should bear the risk because Schroder had
                    constructive notice of the Notice of Prospective
                    Default .................................................................... 16

            3.    Schroder should bear the risk because the contract
                    was for Stone & Youngberg to act as Schroder's
                    agent ....................................................................... 18

    CONCLUSION ........................................................................... 20

Plaintiff Stone & Youngberg LLC ("S&Y") submits this memorandum of law in support of its motion for summary judgment against the defendants Schroder Investment Management North America, Inc. ("SIMNA"), Schroder Series Trust (the "Trust") and Schroder Short-Term Municipal Bond Fund (the "Fund") (collectively "Schroder").

## PRELIMINARY STATEMENT

This is an action for breach of a contract to purchase approximately $1 million in municipal securities known as "COPS" (certificates of participation in a revenue stream). The plaintiff, S&Y, is a securities broker-dealer. The defendants are SIMNA, an Investment Advisor that manages over $12 billion of securities for institutions and high net worth individuals, and a Schroder municipal securities Fund that SIMNA manages for which SIMNA ordered the COPS.

There is no dispute about the facts upon which this motion is based. On January 19, 2005, Schroder authorized S&Y to submit a bid at an authorized price of $1,056,250 (plus accrued interest) to purchase COPS from a third party on Schroder's behalf, and also agreed to purchase the COPS from S&Y for an agreed price of $1,057,275 (plus accrued interest) ($1,025 more than the bid price to cover S&Y's costs) if the bid was successful. At least one bond fund managed by Schroder already owned the COPS. S&Y submitted the successful bid, purchased the COPS from the third party and resold them to Schroder for the agreed price on January 19. Schroder agreed to purchase the COPS although at the time it did so it was suspicious that there may be additional information in the marketplace of which Schroder was not aware. Schroder did not inform S&Y of its suspicion.

Schroder reneged on the purchase.  Although it acknowledges the agreement, Schroder claims it is entitled to renege because a purported mutual mistake of fact - that a notice of a prospective default had been circulated to COPS holders by the COPS trustee before Schroder entered the agreement, but neither it nor S&Y was aware of the Notice.  Schroder therefore left S&Y holding the COPS which it had purchased only because Schroder had asked it to do so on Schroder's behalf.

As discussed more fully below, Schroder had notice of the Notice.  The holders of the COPS hold their securities electronically at the Depository Trust Clearing Corporation ("DTC").  On January 11, Notice from the trustee for the COPS was delivered to DTC.  On January 18, the day before the transaction, DTC made the notice of prospective default available through DTC's Legal Notification System ("LENS") to all DTC participants.  Schroder had access to LENS.  In addition, on January 18, DTC sent an email alert about the notice to Schroder's agent for purpose of delivering notice, the custodian bank already holding the COPS for a Schroder managed fund.

In essence, Schroder and S&Y entered into a contract for S&Y to bid for COPS, purchase if the bid was successful, and sell to Schroder, all at agreed prices including a miniscule middleman commission.  S&Y performed and Schroder breached.

Schroder's argument that the contract is void because of mutual mistake is wrong as a matter of law.  Under well-established law, the doctrine of mutual mistake does not apply to securities transactions where the mistake is one which simply affects the value of the securities.  Even if mistake of fact were applicable, Schroder should bear the risk of the mistake for the reasons set forth more fully below.

<u>FACTS</u>

A.     **The Parties**

S&Y is registered as a broker-dealer with the SEC and the states of the United States, and provides brokerage services to, among others, Schroder, primarily with respect to municipal securities.  Mark McCabe ("McCabe") is the representative of S&Y who services Schroder. (McCabe Tr. 25).[1]

SIMNA is an SEC-registered investment adviser.  It manages over $12 billion of securities for institutional investors and high net worth individuals.  SIMNA is the investment adviser and portfolio manager of the Trust and the Fund.  The Fund is a series of the Trust. SIMNA designated the Fund as its account to which the COPS were to be allocated.  (Answer ¶ 8, attached as Ex. 2 to the Purcell Aff.).

David Baldt ("Baldt") is an Executive Vice President at SIMNA and a portfolio manager of SIMNA client accounts, including the Fund and the Intermediate Term Municipal Bond Portfolio of the Hirtle Callaghan Trust (the "Hirtle Callaghan Fund"), a public mutual fund that owned COPS.  (Baldt Tr. 5; Defendants' Response No. 2 to Plaintiff's First Request for

---

[1]     References to "McCabe  Tr. __" are to the transcript of the deposition of Mark McCabe, excerpts of which are attached as Exhibit 3 to the Affidavit of William O. Purcell, Esq., sworn to on April 26, 2006 ("Purcell Aff.").  References to "Baldt  Tr. __" are to the transcript of the deposition of David Baldt, excerpts of which are attached as Exhibit 4 to the Purcell Aff. References to "Beck  Tr. __" are to the transcript of the deposition of Susan Beck, excerpts of which are attached as Exhibit 5 to the Purcell Aff.  References to "Russo  Tr. __" are to the transcript of the deposition of Denise Russo, excerpts of which are attached as Exhibit 6 to the Purcell Aff.

References to "Russo Aff. ¶ __" are to the affidavit of Denise Russo, sworn to on December 19, 2005.  References to "Lundberg Aff. ¶ __" are to the affidavit of Loretta A. Lundberg, sworn to on December 14, 2005.

Admissions, attached as Ex. 7 to the Purcell Aff.).  As portfolio manager Baldt is responsible for the day-to-day portfolio management of client accounts, including the purchasing and selling of securities. (Baldt Tr. 5-6).

Baldt first became familiar with the COPS in 1991 when he purchased them for the Hirtle Callaghan Fund at the time of their original issue.[2]  (Baldt Tr. 16; 19).  After this purchase, the COPS were placed in the name of a custodian bank which holds securities on behalf of mutual funds, like the Hirtle Callaghan Fund.  The securities were held electronically at DTC.  State Street Bank ("State Street") was the custodian bank for the Hirtle Callaghan Fund from January 6 through at least January 30, 2005.  (Defendant's Response No. 4 to Plaintiff's First Request for Admissions, attached as Ex. 7 to the Purcell Aff.).  From the time of this initial purchase Baldt periodically checked on the status of the COPS.  (Baldt Tr. 23-24).  He decreased or terminated checking the status before October 2003 because he believed that the COPS were "over collateralized," i.e., the real estate underlying the COPS which would be available in the event of default was sufficient to pay the principal.  (Baldt Tr. 24-26).

Baldt and McCabe have engaged in hundreds of bond purchase and sale transactions over the course of approximately ten years.  (McCabe Tr. 25-26).  See also Baldt Tr. 10; 12-13. Therefore, McCabe was familiar with which funds and accounts Baldt served as portfolio manager, and knew that Baldt was the portfolio manager for the Hirtle Callaghan Fund. (McCabe Tr. 12-13).

---

[2]     At the time of the original issue Baldt was not an employee of SIMNA.  However, since he remained the portfolio manager for the Hirtle Callaghan Fund when he became an employee of SIMNA, SIMNA became the investment manager for the Hirtle Callaghan Fund.  See generally Baldt  Tr. 19; 23-24.

Susan Beck ("Beck") is a First Vice President at SIMNA.  She is also a portfolio manager and reports to Baldt.  (Beck Tr. 5; 8-9).  Together, Baldt and Beck were customers who were integral to McCabe's business.  (McCabe Tr. 25-26).

### B.     The COPS

The COPS are certificates of participation in lease revenues which have a principal and an interest component.  Dade City, Florida, leased a building from the COPS trustee and subleased to the State of Florida**.**  In the event of termination of the lease, the COPS trustee was entitled to sell the building and use the principal to pay off the COPS.  The State of Florida decided not to renew the sublease so Dade City announced that it was not renewing the lease. The trustee then sent the Notice to DTC as described below.

### C.     The Contract

On January 19, 2005 McCabe learned through another brokerage firm of the opportunity to submit bids to purchase approximately a million dollars worth of COPS.  (McCabe Tr. 12). McCabe, who was not familiar with the COPS, looked for a description of the COPS and a listing of public holders on the Bloomberg financial reporting system (the "Bloomberg System"). (McCabe Tr. 12).  The listing of public holders showed that the Hirtle Callaghan Fund owned COPS.  (McCabe Tr. 12; McCabe Dep. Ex. 16, Holdings Search, attached as Ex. 3 to Purcell Aff.).  Because McCabe knew that Baldt was the portfolio manager for the Hirtle Callaghan Fund, he called Baldt to inquire whether Baldt would be interested in bidding on the COPS for one of SIMNA's accounts.  (McCabe Tr. 12; 37; Baldt Tr. 27-28).  Beck had also learned of the bidding opportunity through another broker.  She informed Baldt and also told Baldt that they needed more information.  (Beck Tr. 33-35; 42-45; Beck Dep. Ex. 5, January 19, 11:33 a.m.

email from Beck to Baldt, attached as Ex. 5 to Purcell Aff.)   She and Baldt, however, did no further research before entering the agreement.  (Beck Tr. 69-70).

McCabe then emailed Baldt and Beck the description of the COPS from the Bloomberg System.  He also informed them that the COPS were evaluated by J. J. Kenny, a national pricing service, at a price of $103.25 per $100 face value of the COPS and that the seller wanted to sell 1,025 COPS.  (Baldt Tr. 35-36; 38; Baldt Dep. Exs. 27-29, January 19, 2005 emails between McCabe, Baldt and Beck, attached as Ex. 4 to the Purcell Affidavit).  Baldt told McCabe he was interested in purchasing the COPS and authorized McCabe to bid on them at $103.05 per $100 face value ($1,056,262.50).  (Baldt Tr. 29-30; 55; McCabe Tr. 14; Beck Tr. 28; 53).  McCabe then placed a bid on the COPS with an offering broker at this price on behalf of Schroder, which he confirmed with Beck via email.  (McCabe Tr. 37; Beck Tr. 54-55; Beck Dep. Ex. 7, January 19, 2005 11:54 a.m. email from McCabe to Beck, attached as Ex. 5 to the Purcell Aff.).

After McCabe placed the $103.05 bid on behalf of Schroder, the offering broker told him that the seller of the COPS wanted to sell the COPS for $104.25.  McCabe passed this information on to Beck and advised Beck that he told the broker that he could not go higher than $103.05.  (McCabe Tr. 38-39; Beck Tr. 55; Beck Dep. Ex. 8, January 19, 2005 12:04 p.m. email from McCabe to Beck, attached as Ex. 5 to the Purcell Aff.).  Beck informed McCabe that Schroder did not want to purchase the COPS at $104.25, but she authorized him to increase the bid to $103.30 per $100 face value of the COPS.  (Beck Tr. 57-61; Beck Dep. Ex. 9, January 19, 2005 12:21 p.m. email from Beck to McCabe, attached as Ex. 5 to the Purcell Affidavit; Beck Dep. Ex.11, January 19, 2005 12:32 p.m. email from Beck to McCabe, attached as Ex. 5 to the Purcell Aff.).  Before increasing the bid on behalf of Schroder, McCabe was advised by the offering broker that the earlier bid of $103.05 was acceptable to the seller.  McCabe told the

offering broker that S&Y would purchase at that price.  (McCabe Tr. 40).  McCabe called Beck to inform her that the $103.05 bid was accepted.  Since this accepted bid was the price that S&Y would pay for the COPS, during this conversation McCabe asked Beck how much Schroder would pay S&Y to compensate S&Y for its services.  The difference in price would represent the commission S&Y would receive for the trade.  (Beck Tr. 66-67).

Beck was "suspicious" that there may be information about the COPS of which neither she nor Baldt was aware because there was no negotiation on the part of the seller over the price of the COPS.  (Beck Tr. 69, 70).  Notwithstanding her suspicion, of which she did not inform S&Y, she went ahead with the trade on behalf of Schroder and agreed with S&Y to purchase the COPS.  (Id.; Beck Dep. Ex. 12, January 19 15:43 email from Beck to McCabe, attached as Ex. 5 to the Purcell Affidavit).  Beck subsequently sent McCabe an email suggesting that Schroder pay S&Y $103.15 per $100 face value of the COPS.  The extra 10 cents per $100 was the suggested commission for S&Y, a total of $1,025.  McCabe accepted the commission.  (Beck Tr. 65-70; Beck Dep. Exs. 12-13, January 19, 2005 emails between Beck and McCabe, attached as Ex. 5 to the Purcell Affidavit).  Therefore, Schroder had an agreement with S&Y that it would purchase from S&Y 1,025 COPS at $103.15 per $100 face value of the COPS ($1,031.50 per COP).  (Beck Tr. 68).

Thereafter, S&Y confirmed the transaction with the offering broker and with Schroder.

### D.    Schroder Breached the Contract

Unbeknownst to S&Y, on January 6, 2005, The Bank of New York, as Trustee for the holders of the COPS, issued a Notice of Event of Termination and of Future Event of Default (the "Notice") concerning the COPS.  (Lundberg Aff. ¶ 3; the Notice is attached as Ex. A to the

Lundberg Aff.).  The Notice indicated that Dade City intended to terminate the lease underlying the COPS, thereby undermining the value of the COPS.  (the Notice; Baldt  Tr. 68-69; Beck Tr. 82-83).

As was its customary practice, The Bank of New York sent the Notice on or about January 6, 2005, to DTC for dissemination to the holders of the COPS.  (Lundberg Aff. ¶ 5). The Notice was received by DTC on January 11, 2005.  (Id.)  DTC disseminates information regarding notices of default on LENS.[3]  (Russo Aff. ¶ 2; Russo Tr. 16).  On January 18, 2005, a day before the transaction between S&Y and Schroder, DTC posted a copy of the Notice on LENS.  (Russo Aff. ¶ 6; Russo Tr. 33).  Therefore, all participants in DTC, including State Street, had access to the Notice on LENS on January 18, 2005.  (Russo Tr. 56-57).  Indeed, as a LENS subscriber, in addition to being a participant, State Street received email notification of the Notice.  (Russo Tr. 24; Russo errata sheet).  Schroder itself also had access to the Notice on January 18.  (Beck Tr. 87-88).

Between January 19, the date Schroder instructed S&Y to purchase the COPS on its behalf, and January 21, Beck and Baldt discovered the Notice or the information contained in the Notice.  (Beck Tr. 75-79; Baldt Tr. 62-63).  On January 21, after discovering this information about the COPS, Baldt called McCabe and told him that Schroder would not accept delivery of the COPS.  (Baldt Tr. 62; McCabe Tr. 43).

---

[3]	LENS is a web-based system whereby for a fee, registered users can receive or have access to information relating to various securities.  Typically DTC will post an exact image of the notice it receives on LENS.  (Russo Aff. ¶ 5; Russo Tr. 21-22).

On January 24, 2005, the settlement date between S&Y and Schroder, S&Y attempted to settle the trade and deliver the COPS to Schroder three times, however, Schroder refused each delivery attempt.  (Baldt Dep. Ex. 48, February 3, 2005 email from Jessica Ceballos to Mesheia Finney-Alexander, attached as Ex. 4 to the Purcell Aff.).

## ARGUMENT

### A.     Standard of Review

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of fact exists only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The material facts in this case are undisputed: S&Y and Schroder entered into a contract whereby S&Y was to bid for and purchase COPS on behalf of Schroder and Schroder was to purchase COPS from S&Y for an agreed upon price.  S&Y performed and Schroder breached.  As set forth below, summary judgment should be granted to S&Y as a matter of law because the doctrine of mutual mistake does not apply to these factual circumstances.  Furthermore, even if the doctrine were to apply, Schroder should bear the risk of loss in the transaction, because it suspected a problem as to the COPS but elected to proceed, it had constructive notice of the publicly available market information and S&Y, in substance, acted merely as Schroder's agent.  Accordingly, Schroder should not benefit from the doctrine of mutual mistake.

**B.      The Doctrine of Mutual Mistake Does Not Apply as a Matter of Law Because the Mistake Relied Upon By Schroder Was One That Only Affected the Value of Securities**

Under New York law, "a contract is made voidable by … mutual mistake only where the asserted mistake concerns 'a basic assumption on which the contract was made.'" <u>Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.</u>, 157 F.3d 933, 940 (2d Cir. 1998) (<u>quoting</u> Restatement (Second) of Contracts § 152 (1979)).  In a securities transaction, where the parties "were not mistaken as to the subject of their exchange," i.e. the security itself, and "were only mistaken as to the proper valuation of the securities," the doctrine of mutual mistake does not apply.  <u>In re the Leslie Fay Companies, Inc. Sec. Litig.</u>, 918 F.Supp. 749, 771 (S.D.N.Y. 1996) (Connor, J.) (<u>citing</u> <u>Sherwood v. Walker</u>, 66 Mich. 568, 33 N.W. 919 (1887)).  "Mutual mistake in *valuation* [of securities] does not warrant restitution." <u>Id.</u> (emphasis in original).

<u>In re Leslie Fay</u> was a securities class action where investors alleged securities fraud against outside auditors, among others, in connection with their purchase of common stock.  The auditors brought cross claims and third party claims against the officers and directors of the company.  Among other things, the auditors argued that sales of the company's stock by some of the third party defendants during the class period should be rescinded on grounds of mutual mistake of fact, and the profits from those transactions should be paid to plaintiffs as restitution. The alleged mistake was that the public information upon which the parties had relied was inaccurate.  As a result of restated financial statements, the value of the company's stock fell from $12 per share just prior to the commencement of a company investigation to $2.75 per share after the company filed for bankruptcy.

The court dismissed the auditors' claim of mutual mistake because it affected the value of the stock issued and not the subject of the parties' exchange – i.e. the stock itself.

- 10 -

For similar reasons, BDO's claim for restitution under the theory of mutual mistake must be dismissed. BDO argues that, under the common law doctrine of mutual mistake of fact, because the parties were mistaken as to a basic assumption of material fact regarding the goods sold (i.e., the Leslie Fay stock), the sale should be annulled, and TPDs should be required to disgorge their profits.

Application of the doctrine of mutual mistake is illogical in the instant case, and would give rise to far-reaching undesirable implications. Even assuming that this doctrine can be applied to a sale of securities, the "mutual mistake" must be as to the very nature of the subject sold – for example, where what both parties believed to be a barren cow turns out to be with calf. Sherwood v. Walker, 66 Mich. 568, 33 N.W. 919 (1887). The parties here, however, were not mistaken as to the subject of their exchange (stock in Leslie Fay). They were only mistaken as to the proper valuation of the securities. Mutual mistake in *valuation* does not warrant restitution. Id. (emphasis in original).

The Court went on to point out the far-reaching and undesirable effect on the securities markets if the auditors' argument were accepted:

If we were to adopt [the auditors'] analysis, such reasoning would apply to everyone who sold stock during the Class Period. Not only would TPDs have to disgorge their profits, but everyone who sold stock during the Class Period, including those who were not involved in the alleged fraud, would be required to disgorge their profits.

Taking [the auditors'] argument to its logical conclusion, whenever there is a sale of securities from one investor to another, if it turns out that a basic assumption on which the parties relied – i.e., that publicly available financial information was accurately reported – turns out to be false, there would be grounds for restitution. … We conclude that the claim of restitution under the theory of mutual mistake must be dismissed. Id.

Thus, the reliance on accuracy of public information in a securities transaction affecting value will not support a claim of mutual mistake. Otherwise the securities markets would be chaotic. Here, Schroder's claim is just like the claim in In re Leslie Fay – the unknown information affected the value of the COPS and not the fact that the COPS were the subject of the sale. Indeed, both Baldt and Beck acknowledged the Notice affected the value of the COPS,

and not the fact that they were buying COPS.  (Baldt Tr. 68-69; Beck Tr. 82-83)[4].  Furthermore, Schroder's argument for application of the doctrine here has even less of a basis than the auditors' in In re Leslie Fay.  In that case, the information not known was fraudulently concealed, whereas in this case, accurate information was publicly available and Schroder had access to it.

Similarly, in Independent Order of Foresters v. Donaldson, Lufkin & Jenrette, Inc., 1997 WL 563348 *7 (S.D.N.Y. Sept. 9, 1997), aff'd in part and rev'd in part on other grounds, 157 F.3d 933 (2d Cir. 1998), the Court dismissed an aggrieved investor's claim of mistake in connection with the investor's purchase of collateralized mortgage obligations.  The Court found that the circumstances of the case did not support a finding that there was a mutual mistake of fact where the investor claimed mistake, "not as to the essential terms of the contract – for example, what it bought – but a mistake as to the products' performance." Id. at *7.  See also Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc., 165 F.Supp.2d 615, 624 (S.D.N.Y. 2001) (investor brought an action alleging inter alia rescission arising out of the investor's purchase of stock in a private placement; court held that the remedy of mistake was not available as a matter of law where the alleged mistake involved the size of a private placement, affecting the value of the stock purchased, and not the stock which was the subject of the transaction).

New York law on mutual mistake is consistent with the analysis of these cases.  In Merryman v. Gottlieb, 99 A.D.2d 893, 894, 472 N.Y.S.2d 488, 490 (3d Dep't 1984), the

---

[4]     In fact, Baldt was aware of the risk of default before the transaction, but believed it was not a great risk because the COPS were "over collateralized."  (Baldt Tr. 24-26).

purchasers of stock in a close corporation sought to rescind the contract for the sale of the stock based on a mistake as to the value of inventory in the corporation.  The court found that there was no mutual mistake of fact when it was clear from the record that the transaction involved a sale of the majority interest in the corporation, which included the inventory.  "The fact that … [the seller] may have overestimated the value of the inventory, does not mean that there was a mistake over the subject of the contract."  Id. The court further noted that the purchasers' mistake as to the value of the inventory was attributable to their own negligence since they were given the opportunity to view the inventory and failed to do so.

In this case there was no mistake as to a basic assumption of the contract or as to the subject of the exchange between S&Y and Schroder.  As in In re Leslie Fay and Order of Foresters, reliance on accuracy of market information only goes to value, and is not the "basic assumption" that would support application of the doctrine.  Baldt and Beck acknowledged that they gave McCabe the authority to bid on the COPS at $103.05 per $100 face value.  (Baldt Tr. 29-30; 55; Beck Tr. 28; 53).  At that time, Baldt, Beck and McCabe knew that the subject of the transaction would be for the purchase of 1,025 COPS.  Ultimately, when Schroder agreed to add $1,025 to the total purchase price for S&Y's services it was clear that Schroder would be purchasing 1,025 COPS from S&Y at $103.15 per $100 face value.  (Beck Tr. 68; Beck Dep. Ex. 12, January 19, 15:43 email from Beck to McCabe, attached as Ex. 5 to the Purcell Aff.).

After the contract was entered between the parties and S&Y performed, Schroder and S&Y learned that the Notice had been issued, thus affecting the value of the COPS.  As noted in In re Leslie Fay, mistake as to the value of securities, or as to the accuracy of market information that only affects the value of the securities, does not warrant failure to perform or a rescission of the contract based on mutual mistake.  Indeed, professional investors like SIMNA and other

investors take the risk every day of default or severe loss of value in the securities they purchase based on unknown information.

Schroder, despite its access to LENS, its suspicion and professed need for more information, agreed to the transaction, conducted research afterward and then decided to renege. Like <u>Merryman</u> its "mistake" was attributable to its own negligence.

Therefore, as a matter of law, Schroder's claim fails and summary judgment should be granted to S&Y.[5]

### C.    <u>Schroder Should Bear the Risk Even If Mutual Mistake were to Apply</u>

### 1.    **Schroder should bear the risk because it was aware that it had limited knowledge of the facts and elected to proceed**

The Restatement of Contracts states that a contract may be voidable by an "adversely affected party" if the doctrine of mutual mistake applies, "unless that party bears the risk of the mistake."  Restatement (Second) of Contract §152 (1979).  "A party bears the risk of mistake when he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts which the mistake relates but treats his limited knowledge as sufficient."  Restatement (Second) of Contracts §154(b) (1979).

When Beck was informed of the opportunity to bid for the COPS by another broker and McCabe, she advised Baldt that she believed Schroder needed more information.  (Beck Dep.

---

[5]    Damages are available in a breach of contract claim to compensate the injured party for the loss caused by the breach and are generally calculated by the plaintiff's actual loss.  <u>See</u> <u>U.S. Naval Institute v. Charter Communications, Inc.</u>, 936 F.2d 692, 696 (2d Cir. 1991) (<u>citing</u> 5 Corbin on Contracts § 1002, at 31 (1964); Restatement (Second) of Contracts § 347 (1981)).  Although S&Y recently received payment of the face amount of the COPS with some interest, it has still not been fully compensated for its loss.

Ex. 5, January 19 11:33 a.m. email from Beck to Baldt, attached as Exhibit 5 to the Purcell Aff.).

Yet Baldt and Beck authorized S&Y to bid on behalf of Schroder without obtaining any more

information.  Neither Beck nor Baldt researched the COPS before placing an order with S&Y to

purchase the COPS.  In addition, Beck admitted that she was suspicious on the day of the

transaction that there may be adverse information about the COPS of which Schroder was not

aware, and yet Schroder went ahead with the transaction.  Beck testified at her deposition:

> Q:   At this point in time [after Beck and McCabe agreed that Schroder would pay S&Y $103.15 per $100 face value of the bonds], had you or Mr. Baldt, to your knowledge, done anything else to determine if there had been material events with respect to these securities?
>
> A:   I got suspicious when there was no negotiation on the dollar price for these bonds from the seller, and so, I did start – I did not know what I was thinking it could lead to, but I did start looking into making sure there was nothing we were not aware of via the normal channels.
>
> Q:   When did that suspicion occur to you?
>
> A:   That occurred to me when they hit that 103.05 dollar price coming down from a dollar price of 104 without any negotiation in between.
>
> Q:   Yet you decided to go ahead with the purchase at 103.15 with Stone &Youngberg?
>
> A:   That's correct.

(Beck Tr. 69:9-70:1).

Thus, Beck thought Schroder needed more information and knew neither she nor Baldt

researched the COPS before entering into a contract with S&Y.  She was also suspicious that

there may be adverse information about the COPS she did not know about.  Yet despite this,

Beck, on behalf of Schroder, agreed to perform under the contract.   Schroder accordingly bears

the risk of any mistake.  See Restatement (Second) of Contracts §154(b), cmt. c (1979) ("If he

was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of mistake").

### 2. Schroder should bear the risk because Schroder had constructive notice of the Notice of Prospective Default

Schroder should also bear the risk of mistake because it had constructive notice of the Notice.  Schroder and State Street, Schroder's agent for the purpose of receiving Notice, had access to LENS, the method by which the trustee for the COPS disseminated material information about the COPS to COPS holders.

On January 6, 2005, The Bank of New York, as Trustee for the holders of the COPS, issued the Notice. (Lundberg Aff. ¶ 3; the Notice is attached as Ex. A to the Lundberg Aff.)  As was its customary practice, The Bank of New York sent a copy of the Notice to DTC for dissemination to bondholders.  DTC received the copy of the Notice on January 11, 2005. (Lundberg Aff. ¶ 5).  It is DTC's customary practice to disseminate information to holders of securities regarding notices of default on LENS and to email notice alerts to participants who are LENS subscribers.  (Russo Aff. ¶ 4; Russo Tr. 16; 24).  On January 18, 2005, a day before the transaction between S&Y and Schroder, DTC posted a copy of the Notice on LENS and sent an email alert to participants who were subscribers, including State Street.  (Russo Aff. ¶ 6; Russo Tr. 24; 33; Russo errata sheet).  Accordingly, those with access to LENS could view a copy of the Notice as of January 18, 2005.  (Russo Aff. ¶ 7; Russo Tr. 33).

In January 2005, Schroder had a LENS password and therefore could itself have gained access to the notices posted on LENS on January 19.  (Beck Tr. 87-88).  Had Schroder tried to find information pertaining to the COPS, it would have discovered the Notice that was posted on LENS on January 18.  The fact that neither Baldt nor Beck attempted to access LENS or try to

get any information about the COPS on January 19, and did not attempt to access LENS until January 24 (Beck Tr. 87), does not excuse Schroder's ignorance of the Notice.

As noted above, State Street was the custodian for the Hirtle Callaghan Fund, another fund managed by SIMNA which already owned the COPS. State Street was the custodian bank for that fund through at least January 2005. (Defendants' Response No. 4 to Plaintiff's First Request for Admissions, attached as Ex. 7 to the Purcell Aff.). A custodian bank holds securities on behalf of a mutual fund, like the Hirtle Callaghan Fund, and is responsible for receiving information, including any material notices about bonds, and immediately sending these notices to any bondholder on behalf of whom they hold those bonds. (Beck Tr. 84-85). Notices to funds managed by Schroder are sent immediately to Schroder by the custodian. Therefore, in the instant case, State Street was responsible for receiving any material notices like the Notice and immediately sending this information to SIMNA as investment manager for the Hirtle Callaghan Fund. (Beck Tr. 84-85). Accordingly, State Street was SIMNA's agent for this purpose. (Beck Tr. 85).

Since State Street, Schroder's agent, had access to LENS and the Notice, Schroder itself had notice. "[W]hen an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's … liabilities vis-à-vis a third person the agent's knowledge is imputed to the principal." Veal v. Geraci, et al., 23 F.3d 722, 725 (2d Cir. 1994) (citing Restatement (Second) of Agency §§ 9(3), 268, 272, 275 (1958)). See also Restatement (Second) of Agency § 9(3) (1958) ("A person has notice of a fact if his agent has knowledge of the fact, reason to know it or should know it, or has been given a notification of it … ."). Because State Street had access to LENS and the Notice and received an email alert about the Notice, it was on notice. As Schroder's agent for this

purpose, this notice is imputed to Schroder.  Further, Beck, who thought she needed more information and was suspicious that there may be adverse information unknown to her, could have called State Street before she confirmed the transaction with S&Y.  Instead, she did so afterward.

### 3.    Schroder should bear the risk because the contract was for Stone & Youngberg to act as Schroder's agent

Schroder agreed that S&Y should bid for the COPS, at a price set by Schroder, purchase them in its own name, and sell them to Schroder for an amount set by Schroder to include payment for S&Y's services.  The fact that S&Y purchased and resold as principal does not change what is fundamentally a contract of agency - a securities firm, the agent, acts as a middle-man in buying the securities from one party in order to sell them to another party, the principal. (Beck Tr. 12; McCabe Tr. 22).  The firm/agent does not have the particular securities in inventory, but only buys the securities at the direction of the principal in order to resell to the principal for a commission.  The spread between the purchase and sale price is tantamount to a commission.  Indeed, Schroder referred to the additional amount it added to the bid price as a "commission."  (Beck Tr. 67).

There can be no dispute that the contract between S&Y and Schroder for the bid, purchase and sale of the COPS was in substance an agency contract.  When McCabe became aware of the opportunity to bid on the COPS, he immediately contacted Baldt to see if Baldt was interested in purchasing the COPS because he knew that Baldt was familiar with them and already owned them.  Schroder already knew from another broker that the COPS were being offered by a third party on a competitive bid basis.  (Beck Dep. Ex. 5, January 19 11:33 a.m. email from Beck to Baldt, attached as Exhibit 5 to the Purcell Aff.).  Schroder knew that S&Y

did not intend to purchase the COPS for its own account.  S&Y justifiably relied on Schroder's

agreement that the purchase of the COPS was solely to resell to Schroder.  At his deposition

McCabe testified:

> Q:    Do you consider this or did you consider this transaction a riskless trade?
>
> A:    Yes, I did.
>
> Q:    And why is that?
>
> A:    Because … we would not have bid on the bonds without an order.  This is
>       not a security that we would make markets in, so we would not have bid
>       that bond unless David [Baldt] had given to me an order.  So we consider
>       ourselves never at risk with the firm's capital because all we were doing
>       is, on the 24th [the settlement date of the trade] we were paying one
>       person for the bond and immediately selling the bonds to a customer and
>       just working for a small amount of commission in between.

(McCabe Tr. 48:19 - 49:9).

Under these circumstances, S&Y was acting as Schroder's agent pursuant to the

agreement to bid, buy the COPS on the agreed terms and sell them to Schroder.  Restatement

(Second) of Agency § 1 (1958).  According to the Restatement (Second) of Agency § 432

(1958), "[a] principal is subject to a duty to an agent to perform the contract which he has made

with the agent."  Schroder does not dispute that S&Y was buying the COPS on its behalf and

reselling them to Schroder with an agreed commission.  Only when the principal can claim one

of certain enumerated defenses to liability in the Restatement (Second) of Agency §§ 467-469A

(1958) is performance under a principal-agent contract excused.  These defenses include

illegality of the contract, statute of frauds, disloyalty or insubordination of the agent, among

others.  Since Schroder cannot claim any of the defenses to liability listed in the Restatement

(Second) of Agency, it was therefore obligated to perform its obligations under the contract with

S&Y.  There was no mistake about any assumption, basic or otherwise, with respect to the services S&Y was to perform.  Thus, Schroder should bear the risk.

Accordingly, summary judgment should be granted to S&Y as a matter of law because even assuming the doctrine of mutual mistake applies, Schroder bears the risk of that mistake.

## <u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment should be granted in favor of the plaintiff, S&Y.

Dated: New York, New York
       April 26, 2006

                         KIRKPATRICK & LOCKHART
                         NICHOLSON GRAHAM LLP

                  By:    /s/  William O. Purcell
                         William O. Purcell (WP 5001)
                         Jessica L. Jiménez (JJ 3107)
                         599 Lexington Avenue
                         New York, New York  10022
                         Telephone: 212.536.3900
                         Facsimile: 212.536.3901

- 20 -